# AFFIDAVIT

I, Dustin Dobbs, Special Agent for the Food and Drug Administration, Office of Criminal Investigations, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Food and Drug Administration, Office of Criminal Investigations ("FDA/OCI"), assigned to the Washington Metro Field Office, Abingdon, Virginia. I am responsible for conducting criminal investigations involving violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Section 301–399g, the Public Health Service Act ("PHSA"), 42 U.S.C. § 262, and related Title 18 offenses. As a Special Agent with FDA/OCI, I am an investigative law enforcement officer of the United States of America within the meaning of Section 2510(7) of Title 18 United States Code. I have been employed at FDA/OCI since December 2022 and prior to my current assignment, I was employed as a Special Agent by the Federal Bureau of Investigation from September 2017 to December 2022. Based on my training and experience in law enforcement, and conversations with other FDA/OCI Special Agents and other Law Enforcement Officers, I am familiar with the secure and controlled supply chain for prescription drugs in the United States and how their illegal importation could violate federal law.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

3. This affidavit is submitted in support of the arrest of Giles Robert Alan Howard (hereinafter "Bob Howard") and John Thomas Howard (hereinafter "John Howard"), who

serve as the responsible corporate officers of CanaRx Services Inc./CRX Intl. (hereinafter "CRX"), a company subject to FDA oversight. Based on my training, experience, and the investigation described herein, I have probable cause to believe that Bob Howard and John Howard, in their capacities as responsible officers of CRX, did knowingly and willfully conspire to commit and committed the offenses of importing prescription drugs in the United States in violation of 21 U.S.C. § 331 (t) and (aa); introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. § 331(a); and smuggling by knowingly and willfully importing merchandise contrary to law in violation of Title 18 U.S.C. § 545. They also conspired to defraud FDA and CPB of their regulatory authority as shown in this affidavit was in violations Title 18 U.S.C. § 371, and did so with the intent to defraud and mislead.

## JURISDICTION

4. This Court has jurisdiction to issue the requested warrant, because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. See 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that . . . has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As described in the paragraphs below, my investigation indicates that numerous suspected illegal transactions occurred throughout the United States, including in the Western District of Virginia (WDVA).

## FDA's REGULATION OF PRESCRIPTION DRUG IMPORTATION

5. The Food and Drug Administration ("FDA") of the United States Department of Health and Human Services is the federal agency responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act. 21 U.S.C. § 301, et seq. ("FDCA"). The FDCA, among other things, governs the premarket approval, manufacturing, labeling, and distribution—to include the regulation of the supply chain and

importation—of prescription drugs.[1] The requirements of the FDCA, in part, are meant to ensure that drugs sold for human use are safe and effective and bear labeling that contains accurate and adequate information.

6. A Congressional goal in enacting the premarket approval, labeling, secure supply chain, and importation provisions of the FDCA is to ensure the integrity of America's drug supply. Congress determined that the public interest in the safety and efficacy of prescription drugs distributed to American consumers is so great as to warrant imposition of the highest standard of care on those who distribute these products to the public. Under the FDCA, the responsibility for maintaining the quality and safety of drugs is not placed on the innocent public who purchase drugs, but rather on those who manufacture and distribute them. Congress has determined that consumers have a right to expect that those who distribute and dispense drugs will be vigilant and responsible in matters that affect the public health. Furthermore, consumers expect that prescription drugs they receive are safe, effective, and are, in fact, the products approved by FDA for the United States market.

7. In the United States, with exceptions not applicable here, prescription drugs are distributed in a closed and tightly controlled supply chain from the time they leave the manufacturer to when they are dispensed to or administered to the patient. The Drug Supply Chain Security Act ("DSCSA"), enacted as part of the Drug Quality and Security Act in 2013, amended the FDCA to require, among other things, product tracing, product identifier, verification, and

---

[1] Prescription drugs are defined as those drugs that either (a) because of their toxicity and other potential for harmful effects, or the method of their use, or the collateral measures necessary to their use, are not safe for use except under the supervision of a licensed practitioner; or (b) are limited to such use by their FDA approval, either in a new drug application (NDA) for a pioneer drug, or an abbreviated new drug application (ANDA) for a generic equivalent of a pioneer drug. *See* 21 U.S.C. § 353(b)(1).

authorized trading partner requirements for manufacturers, repackagers, wholesale distributers, and dispensers to facilitate the tracing of products through the supply chain. 21 U.S.C. § 360eee-1. Trading partners involved in transactions involving prescription drugs also must be either registered with FDA (manufacturers) or licensed with the relevant state and/or federal authorities (wholesalers and dispensers). These supply chain integrity safeguards were enacted to enhance the ability of the FDA to protect consumers from counterfeit, stolen, diverted, and contaminated drugs by establishing a national framework for electronic drug tracing throughout the supply chain.

8. Prescription drugs that are manufactured in the United States and exported to other countries may only be reimported by the manufacturers themselves. 21 U.S.C. § 381(d)(1)(A). Prescription drugs that are manufactured outside the United States may only be imported to the U.S. market if the manufacturer or importer complies with all applicable laws and regulations of the United States to assure the drugs meet FDA's standards for quality, safety, and effectiveness. FDA and HHS have provided two pathways to allow importation of certain prescription drugs that were originally intended for foreign markets.

9. One pathway, enacted by Congress in the 2017 Amendments to the FDCA and further described in a final guidance for industry, describes procedures manufacturers can follow to facilitate the importation of prescription drugs that are FDA-approved, manufactured abroad, authorized for sale in any foreign country, and originally intended for sale in that country (known as "multi-market approved product" or MMA product). 21 U.S.C. § 381(d)(1)(B).[2]

---

[2] The requirements include, among other things, that the manufacturer has authorized the drug to be marketed in the United States and has caused the drug to bear the FDA-approved labeling. 21 U.S.C. §§ 331(t), 381(d)(1)(B). The importer of the drug must still comply with the Drug Supply Chain Security Act, meaning the drugs would need to be imported by either the manufacturer (defined as the holder of the new drug application or biological license) or an authorized trading partner to ensure that the appropriate product safety and supply chain integrity safeguards are in

10. The second pathway to import drugs intended for the foreign market into the United States is known as the Section 804 Importation Program, which allows the limited importation of certain prescription drugs from Canada. *See* 21 U.S.C. § 384. In September 2020, the Secretary of Health and Human Services certified that importation of prescription drugs is allowed under Section 384 if done in accordance with the requirements of the regulations promulgated at 21 C.F.R. Part 251 and that such importation would "pose no additional risk to the public's health and safety" and that it "would result in a significant reduction in the cost of covered products" for American consumers. 21 U.S.C. § 384(l)(1)(A), (B).

11. By regulation, FDA developed procedures to allow the importation of drugs under section 804 [21 U.S.C. § 384], but at this time it only allows importation proposals to be submitted by States and Indian tribes.[3] This pathway specifically excludes biological products, infused drugs, and intravenously injected drugs, likely due to safety concerns with these complex products. 21 U.S.C. § 384(a)(3)(B), (C), (D). It also requires that any establishment within Canada engaged in the distribution of a prescription drug that is imported or offered for importation into the United States be registered with FDA and name a United States agent for the establishment. 21 U.S.C. § 384(f).

---

place. As previously described in paragraph 6, authorized trading partners can only be federally or state licensed wholesalers, state licensed pharmacies, or medical practitioners licensed by law to dispense or administer prescription drugs. 21 U.S.C. § 360eee(2)(A), (B), (D).

[3] To date, the Commonwealth of Virginia has not participated in the Importation Program under 21 U.S.C. § 384. In January 2024, FDA approved Florida's Section 804 Importation Program (SIP) making it the first state in the nation to receive federal authorization to import certain prescription drugs under certain conditions. At the time of this document, there are approximately 7 states that have enacted legislation to establish a drug importation program under 21 U.S.C. § 384. Virginia has passed legislation that has established a workgroup to examine the impact of a state importation program but has not established an importation program under 21 U.S.C. § 384. Regardless, defendant would not be eligible to import or facilitate importation under this program even if Virginia had an approved SIP since FDA is currently only authorizing states and not individuals to import prescription drugs under this program.

12. Section 804 [21 U.S.C. § 384], the statute discussed above that allows the importation of wholesale quantities of certain prescription drugs from Canada under limited conditions, also provides for a waiver procedure to allow individuals to import prescription drugs for personal use. 21 U.S.C. § 384(j). The Secretary of HHS has not yet provided the required certification to Congress that this pathway for importation by individuals for their personal use will not pose any “additional risk to the public’s health and safety” and result in a “significant reduction in the cost of covered products to the American consumer.” See 21 U.S.C. § 384(l). Consequently, this pathway is not a viable pathway to import prescription drugs and FDA cannot even consider waivers at this time. FDA has, however, published guidance on personal importation, that predates the above-referenced importation legislation. In that guidance, FDA states that in most circumstances it is illegal for individuals to import drugs into the United States for personal use but that FDA personnel may be more permissive in allowing the personal importation provided that the product is not for further sale or distribution in U.S. commerce and that other conditions are met. This guidance has been in place since at least August of 1997, when it was published in the Regulatory Procedures Manual.[4] These conditions to allow importation from foreign countries include if the imported drug: (1) is for a serious condition for which effective treatment may not be available domestically through commercial or clinical means; (2) is not further commercialized or promoted to persons in the U.S.; (3) does not present an unreasonable risk; and (4) is in a quantity that is less than a 3 month supply and the recipient provides documentation of medical supervision.[5] FDA's guidance on personal importation is not

---

[4] *See generally* https://ntrl.ntis.gov/NTRL/dashboard/searchResults/titleDetail/PB97196182.xhtml;jsessionid=d0609a107e48787b01eda35ea97f under General Guidance on page 409.

[5] *See generally* https://www.fda.gov/industry/import-basics/personal-importation#whatis.

intended as a way for consumers to bring lower-priced prescription drugs into the United States; rather, FDA intended this enforcement discretion to allow individuals to access treatments not otherwise available in the United States.

13. Pharmaceuticals manufactured for foreign markets are almost always considered unapproved and misbranded drugs under U.S. law, whether counterfeit or even if made by the same manufacturer that produced the version sold in the United States. Such drugs may have different approved labeling (including different warnings, dosage recommendations, and indications for use) and may be manufactured in a place different than as listed in the New Drug Application approved by FDA. While the U.S. wholesale distribution market is highly regulated, many other markets around the world are not. Pharmaceutical distributors and brokers who circumvent U.S. law and illegally import foreign pharmaceuticals into the United States put their customers/patients at risk for receiving counterfeit, misbranded, and/or adulterated drugs.

## ADDITIONAL DRUG LAW AND PROHIBITED ACTS

14. The FDCA requires the labels and labeling[6] of all drugs to display certain information. All drugs are required to have labeling that bears adequate directions for use.[7] 21 U.S.C. § 352(f). Because a prescription drug, by definition, is safe for use only under the supervision of a licensed medical practitioner (not a layperson), all prescription drugs must qualify for an exemption to this labeling requirement before they may be introduced into interstate

[6] The FDCA defines the term "label" to mean "a display of written, printed, or graphic matter upon the immediate container of any article. . ." 21 U.S.C. § 321(k). The FDCA defines "labeling" to mean "all labels and other written, printed or graphic matter (1) upon any article or any of its container or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

[7] "Adequate directions for use" are defined by regulation as directions under which the layman can use a drug safely and for the purposes for which it is intended. 21 C.F.R. § 201.5.

commerce. See 21 U.S.C. § 353(b)(2); 21 C.F.R. § 201.100. The exemption to this requirement for prescription drugs is set forth in 21 C.F.R. § 201.100, which imposes a number of conditions,[8] all of which must be met. Several of the conditions relevant here are that: (1) a drug subject to the new drug statute must bear the FDA-approved labeling; and (2) a drug must be lawfully dispensed pursuant to a valid prescription, the parameters of which are determined by state law. To dispense drugs into Virginia, a non-resident pharmacy must be registered with the Virginia Board of Pharmacy and designate a pharmacist-in-charge who is licensed in Virginia. Code of Virginia § 54.1-3434.1. 21 U.S.C. § 201.100 (a), (c). The label also must bear the notation "Rx only." 21 C.F.R. § 201.100 (b)(1); see also 21 U.S.C. § 353(b)(4)(A).

15. Drugs that are required to comply with the new drug approval statute but that do not comply with that statute are "unapproved new drugs" and it is a violation of the FDCA for them to be distributed in interstate commerce. 21 U.S.C. § 331(d).

**<u>Misbranding Provisions</u>**

16. Among other reasons, a drug is considered "misbranded" under the FDCA if any one of the following is true:

a. The drug's labeling lacks adequate directions for use, meaning directions under which a layman can use the drug safely and for the purposes for which it was intended, and

---

[8] This includes that the drug is in the possession: (i) of a person regularly and lawfully engaged in the manufacture, transportation, storage, or wholesale distribution of prescription drugs; or (ii) of a retail, hospital, or clinical pharmacy regularly and lawfully engaged in dispensing prescription drugs; or (iii) of a practitioner licensed by law to administer or prescribe such drugs; and the drug is to be dispensed in accordance with 21 U.S.C. § 353(b), *i.e.* by a valid written or oral prescription by a licensed medical practitioner. 21 C.F.R. § 201.100(a)(1), (2). This exemption also requires that if the drug is subject to section 505 of the Act [21 U.S.C. § 355, or the new drug[8] statute] that it bear the labeling authorized by the approved new drug application.

fails to qualify for an exemption to the labeling requirement. See 21 U.S.C. § 352(f)(1) and 21 C.F.R. §§ 201.5, 201.100;

b. It is manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered with FDA as required under 21 U.S.C. § 352(o); or

c. Its label fails to bear the "Rx Only" symbol required by 21 U.S.C. § 353(b)(4).

**PROHIBITED ACTS**

**<u>Federal Food, Drug, and Cosmetic Act Violations</u>**

17. Under the FDCA, commission or causing the commission of the following constitute a "prohibited act" under the statute:

a. The introduction or delivery for introduction into interstate commerce of a misbranded drug. 21 U.S.C. § 331(a).

b. The introduction into interstate commerce of a new drug in violation of section 505 [21 U.S.C. § 355, i.e. the new drug statute]. 21 U.S.C. § 331(d).

c. The importation of a drug in violation of section 801(d)(1) of the FDCA [21 U.S.C. § 381(d)(1)] or the failure to comply with section 582 of the FDCA [21 U.S.C. § 360eee-1, i.e. DSCSA]. 21 U.S.C. § 331(t).

d. The importation of a drug in violation of section 804 [21 U.S.C. § 384]. 21 U.S.C. § 331(aa).

18. Commission of a prohibited act is a strict liability misdemeanor under the FDCA, punishable by a fine and up to a year in prison for each violation, regardless of the mens rea of the defendant. See 21 U.S.C. § 333(a)(1). If the violation is done with the "intent to defraud or mislead" consumers or a government regulatory agency, commission of a prohibited act constitutes a felony under the FDCA, punishable by a fine and up to three years in prison for each violation.

21 U.S.C. § 333(a)(2). Knowing violations of certain of the importation statutes are felonies punishable up to 10 years in prison. 21 U.S.C. § 333(b)(1)(A).

**Conspiracy**

19. Title 18 U.S.C. § 371 prohibits conspiring to commit an offense against the United States, or to defraud the United States or an agency thereof and doing an act to effect the object of the conspiracy. A violation of 18 U.S.C. § 371 is punishable by a fine and 5 years in prison if the offense that is the object of the conspiracy is a felony; if the object offense is a misdemeanor, then the penalty is equivalent to the maximum penalty for the object offense.

**Smuggling**

20. Title 18 U.S.C. § 545 in summary prohibits knowingly and willfully importing merchandise contrary to law or defrauding the United States government by avoiding customs duties. A violation of 18 U.S.C. § 545 is punishable by fine and/or imprisonment of not more than 20 years.

**A. International Prescription Program**

21. An "International Prescription Program" ("IPP") is generally, and as relevant here, defined as a program that enables individuals to obtain prescription medications across international borders, often to reduce costs. The IPP programs discussed in this document are inconsistent with the FDCA and are illegal, as they source drugs that are not meant for the U.S. market and not FDA approved. There are several public health risks related to IPP, including but not limited to:

a. Safety and quality;

b. Counterfeit medications;

c. Improper dosing/labeling, sometimes in a foreign language;

d. No adverse reporting pathway;

e. Lack of quality control; and

f. Lack of the same regulatory approval or rigor as the US FDA.

22. "International Pharmacy Benefit Managers" ("IPBMs"), also known as specialized plan brokers, as discussed here, are companies that administer prescription drug benefits on behalf of employers. IPBMs are responsible for coordination between the employer, the employee, and the international pharmacy. Part of their duties include but are not limited to:

a. Market IPPs to employers or have IPPs marketed to employers by other companies, such as "Third Party Administrators" ("TPAs");

b. Review employee prescription records to identify employees with recurring prescription drugs that could be sourced internationally;

c. Contact employees (or "plan members") to market IPPs;

d. Coordinate between employees and international pharmacies by collecting prescriptions from employees and sending them to international pharmacies; and

e. Coordinate payment between the employer and the international pharmacy.

23. In short, IPBMs administer the prescription benefit and coordinate between the international pharmacies and the employees.

24. International pharmacies are utilized to fulfill the prescriptions that are provided to them through IPBMs. The foreign pharmacy dispenses the medication and ships it directly to the United States plan member's address.

**B. Target Entity: CanaRx Services Inc./CRX Intl.**

25. CanaRx Services Inc. is a company established in 2002 and primarily located in Windsor, Ontario, Canada. They have a physical location at 235 Eugenie Street West, Suite 105D, Windsor, Ontario, Canada. Related entities, CanaRx Group Inc. and CRX International Inc., are incorporated in Barbados, with an address in Christ Church, Barbados, and a U.S. based post office box in Detroit, Michigan.

26. CRX was founded in or about 2002 and has marketing material on their website that states that they source drugs from "tier one countries," specifically Canada, the United Kingdom, Australia, and New Zealand, for Americans to save money on their "brand-name" maintenance mediations.

27. A review of the "about" page of www.canarx.com from June 18, 2014 self describes the company's "History" as, "CanaRx was the first international prescription provider (IPP) to introduce and supply a public sector program in America."

28. A Canadian company named "1646237 Ontario Inc." is the sole shareholder of CanaRx Group. A Canadian company named "2266578 Ontario Inc." is the sole shareholder of CRX International Inc. The investigation has shown that the company names "CanaRx" and "CRX" appear to be used interchangeably to reference the group of businesses.

29. This investigation has shown that CRX provided a roadmap to ScriptSourcing, LLC, as further defined below, for how to source international drugs for American citizens.

30. Bob Howard is the President and Director of CanaRx Services. He also holds a director position in 1646237 Ontario Inc., CanaRx Group, and CRX. Bob Howard utilizes the email account bob@canarx.com.

31. John Howard is the Treasurer and Director of CanaRx Services Inc., holds an officer position in 1646237 Ontario Inc. and its subsidiaries CanaRx Group and CRX, and is the Treasurer of 2266578 Ontario Inc. John Howard utilizes the email account john@canarx.com.

32. Both Bob Howard and John Howard act as responsible corporate officers of CRX. As this document will show, Bob Howard and John Howard conspired with ScriptSourcing, LLC, to internationally source misbranded prescription drugs and smuggle those into the WDVA and other places throughout the United States.

33. Joseph A. Morris ("Mr. Morris") is the United States based General Counsel for CRX and resides in Chicago, Illinois. Mr. Morris utilizes the email address MDLRusak@aol.com. Although Mr. Morris is General Counsel for CRX, he has been known by this investigation to act in an operations role when speaking publicly and talking to clients of CRX.

a. An October 6, 2021, review of https://www.canarx.com shows the claim "Best Safety Standards in the Business" followed up by the statement, "Sourced from Tier 1 countries designated by the U.S. Congress, medications are backed by a Quality Assurance Team of doctors and pharmacists as well as 20-plus years of experience in the industry. CANARX professionals regularly inspect all licensed pharmacies to ensure that all safety protocols and all American/source country regulations are met. We only use government-certified products from federally approved facilities." The website goes on to state, "The medications on our formulary are the Tier 1 equivalent approved for distribution in the U.S… It's just a matter of who applied the rubber stamp (FDA versus Health Canada, for example). If a medication hasn't been approved in the U.S., it's not on our formulary."

**C. ScriptSourcing, LLC**

34. ScriptSourcing, LLC ("ScriptSourcing") was a private company that offered an "International Prescription Program" ("IPP") marketed to self-funded employer health plans. The company claimed to offer dramatic savings through international sourcing of brand-named drugs.

35. Gary Becker was the founder and CEO of ScriptSourcing. He is described on ScriptSourcing's website, located at https://scriptsourcing.com/founder-story/, as "a health insurance and risk management consultant for more than 30 years."

36. The address listed for ScriptSourcing on their website, scriptsourcing.com, is 3301 Bonita Beach Road Southwest, Suite 108, Bonita Springs, Florida.

37. ScriptSourcing's marketing materials and website consistently emphasize international procurement of brand-name drugs, delivered directly to patients at home, with advertising benefits such as "$0 copay" and "free shipping."

38. One testimonial posted on scriptsourcing.com states: "Through ScriptSourcing's international program, Restasis costs me absolutely nothing and will save our company over $1,000 on an annual basis. What's more, the entire process was so easy. I called the staff at ScriptSourcing who directed me to the source where I can obtain my prescription. I now receive my three-month prescription from Canada shipped directly to my office, as it's more convenient for me."

39. Gary Becker discussed in a video, located at https://www.youtube.com/watch?v=N-LqFHSg78E, that ScriptSourcing's international pharmacy program sources drugs from Canada, United Kingdom, New Zealand, and Australia. Gary Becker described these countries as "tier one countries" with the same oversight and requirements as the FDA in the United States. This information is also found in other marketing material for ScriptSourcing.

40. Mr. Becker stated in a video, located on ScriptSourcing's website, that ScriptSourcing was able to provide solutions to employers in every single state. This, as described in this document, includes the WDVA.

**D. Conspiracy between CRX and ScriptSourcing**

41. In 2024, it was discovered that ScriptSourcing provided FDA regulated drugs to Norwood Surgery Center Urology Group (Urology Group). One of Urology Group's employees, Terrance Heally, had packages of the FDA regulated drug Jardiance he had ordered from ScriptSourcing seized by Customs and Border Protection (CBP). Mr. Heally informed FDA-OCI SAs that after his medications were seized, he called ScriptSourcing to notify them of the issue. ScriptSourcing informed him that shipments were occasionally seized, and they would send him more. On November 19, 2024, Dan Scharff, General Legal Counsel for the Urology Group, informed FDA-OCI investigators that he called ScriptSourcing regarding the matter and ScriptSourcing claimed to Mr. Scharff that their program was compliant in accordance with the "personal use exemption" which your affiant understands to mean FDA's "personal importation policy" allowing importation in limited circumstances and quantities of drugs not commercially available in the United States. *See* ¶ 12. Jardiance does not qualify for this enforcement discretion because, among other things, it is available in the United States.

42. The incident regarding Urology Group is later described in paragraph 73 of this affidavit when discussing a recorded phone conversation between ScriptSourcing's CEO, Mr. Becker, and the Directors of CRX, John Howard and Bob Howard.[9]

43. Also, FDA-OCI dealt with CRX previously in another case. In that case, SA Brian Ballman directed a Confidential Informant (CI) to contact Nicole Elover on March 1, 2022. At the

---

[9] Conversation on July 6, 2026, between Mr. Becker, John Howard, and Bob Howard.

time of the contact, Ms. Elover was a National Sales Executive at ScriptSourcing, located in Owings Mills, Maryland and used telephone number 669-900-6833. Ms. Elover informed the CI that ScriptSourcing was able to "certainly help with international sourcing." Ms. Elover said ScriptSourcing sourced over 800 name brand maintenance medications and specialty medications from international pharmacies located in "other tier one countries," most from Canada. Ms. Elover said the FDA had deemed these tier one countries' regulatory agencies as having the same or higher standards than the FDA. While discussing doing business with ScriptSourcing, Ms. Elover said the CI would not get into any kind of hassle with the FDA. Ms. Elover said the formulary list of the drugs they offered was listed on their website. Ms. Elover said ScriptSourcing was able to source Benicar, epinephrine, biologics, insulin, and diabetic medications, all FDA regulated prescription drugs. Ms. Elover said they also sourced temperature-sensitive medications. Ms. Elover said ScriptSourcing did not source controlled substances, narcotics, or lifestyle medications. Ms. Elover said the prescriptions had to be sent to ScriptSourcing and they processed them with their pharmacy partners.

44. All of the offered drugs mentioned by Ms. Elover are available in the United States and would not qualify for the enforcement discretion granted under any "personal importation policy." Moreover, several of the drug or drug classes listed, e.g. biologics, could not then be legally imported into the United States even by the manufacturer of those drugs under section 801(d)(1) [21 U.S.C. § 381(d)(1)] of the FDCA. *See* 21 C.F.R. § 251.2 (explaining that the term "eligible prescription drug" for purposes of the Section 804 Importation Program does not include, among other things, a biological product).

45. Importation of drugs under section 804 currently only permits importation of drugs from Canada. Based on this fact alone, sourcing drugs from countries other than Canada, as

described by Ms. Elover, would not meet the requirements of Section 804 even if Virginia did have an FDA approved drug importation program in place, which it currently does not.

46. During the March 1, 2022, conversation, Ms. Elover said that ScriptSourcing worked on a performance-based compensation model. When ScriptSourcing sourced medications for less than what was otherwise available, ScriptSourcing charged the client 25% of the savings they were able to obtain. Ms. Elover said the savings were usually 50% to 90%. Ms. Elover said the medication would be the exact same medication coming from the same manufacturer.

47. The only entities that would be able to legally import these "multi-market approved products" are the manufacturer of the drug or an authorized trading partner of that manufacturer after that product has been labeled for the U.S. market.

48. Ms. Elover said ScriptSourcing had been providing these solutions for about seven years (at the time of the conversation, March 1, 2022) and their CEO, Mr. Becker, had used the same solutions for even longer than that prior to ScriptSourcing becoming a formal business. Ms. Elover said ScriptSourcing had over 800 different clients throughout the country. Ms. Elover said they worked only with employers and not with individuals. Ms. Elover said ScriptSourcing typically only sourced for recurring medications. Ms. Elover said invoices were twice per month and they accepted payment via ACH or check, and it was processed out of their Baltimore, Maryland office. Ms. Elover said the company utilized the United States Postal Service for delivery of the medications to the patients. Ms. Elover said they had many clients in Kentucky, where FDA-OCI Special Agent Ballman was located.

49. Ms. Elover said they worked with CanaRx and other pharmacy partners similar to CanaRx to increase their offerings. Ms. Elover said CanaRx was in their network. CanaRx referred to CRX.

50. On March 7, 2022, Ms. Elover emailed the CI to provide him/her with a link to ScriptSourcing's Med Finder tool, https://scriptsourcing.com/med-finder/. The email also had a link to a video that was labeled "THE NEXT 5 YEARS OF RX COSTS." The video described ScriptSourcing's ability to help save employees and employers money. The email also had a link to ScriptSourcing's client portal, https://scriptsourcing.com/client-portal/. This site had a heading labeled ScriptSourcing Services to be Provided and under it was listed "International Pharmacy Program (IPP)".

51. On August 28, 2025, your affiant emailed Glen Becker, known to your affiant to be Gary Becker's son and a ScriptSourcing employee, utilizing an undercover email account. The email requested additional information about ScriptSourcing and asked if they were FDA compliant. Glen Becker emailed back and asked Ms. Haney to assist in setting up a follow-on call. Ms. Haney said, "Happy to help coordinate & yes, we are FDA compliant!"

52. On September 9, 2025, your affiant made an undercover recorded telephone call with Glen Becker and Ms. Haney. At the beginning of the call, I represented to Ms. Haney that I was located in the western side of Virginia, about five or six hours from Baltimore, Maryland. During the call, Glen Becker and Ms. Haney represented ScriptSourcing and described their business model of facilitating the importation of prescription drugs from foreign countries. Specifically, Glen Becker described one solution that ScriptSourcing is most known for, their international pharmacy program. Glen Becker said they "have the ability to source medications internationally from our network of pharmacies, and these are brick and mortar pharmacies," located in "tier one countries, which means they're English speaking (and) they have the same or higher standards of the FDA. So, like Canada, UK, Australia, New Zealand."

53. Glen Becker explained the scale of their operation by saying they have over 2,000 plus name brand specialty meds. Glen Becker went on to say, "we work with over 3000 self-funded

health plans with this solution." Glen Becker described their performance-based compensation model where ScriptSourcing shares the savings for the medication.

54. Later in the call, Glen Becker discussed how the medications were name brand specialty medications that were the "exact same meds you get in the states. They are FDA approved, same manufacturer, same packaging. There is nothing different other than the cost." This fraudulent statement is not only false and misleading, but also in furtherance of fulfilling a scheme to sidestep the FDA supply chain and illegally import drugs from foreign countries.

55. Glen Becker provided a specific example of how ScriptSourcing's international pharmacy program saves some individuals and companies in the United States money. Glen Becker said Skyrizi costs more than $80,000 a year, but their international program could save a little over 50%.

**E. Injury and Safety Risks**

56. ScriptSourcing's international drug importation program has caused injuries to individuals. In February 2025, an individual in Saltville, Virginia was hospitalized due to a small bowel obstruction after she used misbranded Mounjaro sourced by ScriptSourcing utilizing a Canadian pharmacy to import the illegal foreign drugs. This was not the only time their sourced drugs have caused injury.

57. In *Gilead Sciences, Inc., et al. v. Meritain Health, Inc., et al.*, a U.S. patient purportedly suffered "grievous physical harm" after receiving a counterfeit medicine via ScriptSourcing's IPP. *See Gilead Sciences, Inc., et al. v. Meritain Health, Inc., et al.*, 1:24-cv-03566, ECF Doc. No. 296, ¶ 216 (D.Md. Oct. 12, 2025). This case provides additional evidence of personal injury resulting from ScriptSourcing's international sourcing program.

58. Additionally, public health literature warns that international pharmacy programs sourcing drugs for U.S. patients pose significant risks of personal injury. Because these programs operate outside of stringent FDA oversight, patients risk receiving counterfeit, substandard, or mislabeled medications that contain dangerous ingredients or incorrect dosages, which can lead to ineffective treatment, serious adverse effects, overdose, and even death. In addition to the direct risks from the medication itself, a lack of appropriate medical supervision and clear, standard labeling can lead to medication errors and further jeopardize patient safety.[10] [11]

**F. Gilead Sciences v Meritain Health, et al**

59. Gilead Sciences filed a complaint in December 2024 asking for a preliminary injunction to stop a network of companies they alleged were supplying patients with non-FDA approved, imported versions of Gilead's medicines via alternative funding programs. On September 30, 2025, Gilead filed an amended complaint that named, among others, ScriptSourcing, Gary Becker, CRX, Bob Howard, and John Howard. This amendment was filed under case 1:24-cv-03566-JRR in the District of Maryland.

60. The amended complaint alleged that "By 2023, Meritain had known for years that CanaRx, ElectRx, and ScriptSourcing each ran international sourcing programs aimed at illegally importing foreign versions of prescription medicine to insured U.S. patients." Although this civil

---

[10] AMA Council on Science and Public Health. (2024, April). *What should prescribers and policy makers know about US drug importation?*. Journal of Ethics, *26*(4). https://journalofethics.ama-assn.org/article/what-should-prescribers-and-policy-makers-know-about-us-drug-importation/2024-0

[11] Mackey, T. K., & Liang, B. A. (2011). Digital danger: A review of the global public health, patient safety, and cybersecurity risks of the illicit online drug trade. *BMC Medicine*, *9*(1), 117. https://bmcmedicine.biomedcentral.com/articles/10.1186/1741-7015-9-117

case pertained to trademark infringement, the complaints outline how the alleged criminal importation of drugs industry works.

61. These complaints also brought something else to light, harm to U.S. patients related to international pharmacy programs. The complaint stated:

a. "In February 2023, Meritain learned of what it referred to internally as the 'international sourcing horror story,' in which a U.S. patient received counterfeit medicine from ScriptSourcing's IPP, resulting in major physical harm to the patient."[12] As discussed throughout this document, ScriptSourcing often acted as a middle man for CRX's IPP.

b. These allegations show these are not risk free, money saving programs. They prioritize profits, disguised as savings, and put U.S. lives at risk.

**<u>Cooperating Defendant - Information Regarding CRX</u>**

62. On or about May 26, 2026, Mr. Becker, CEO of ScriptSourcing, became a cooperating witness in this matter. Mr. Becker agreed to provide information to the investigative team and make phone calls at the direction of FDA-OCI.

63. During his cooperation, Mr. Becker, in coordination with his legal counsel, provided details pertaining to CRX. Mr. Becker stated that CRX was one of the companies that he worked with to facilitate the importation of prescription drugs from foreign countries. Mr. Becker further stated that CRX was the company that gave him a road map on how to operate an IPP.

---

[12] Under DSCSA, pharmacies in the United States are required to quarantine, report, and investigate suspect product. See e.g 21 U.S.C. § 360eee-1 (d)(4).

64. For instance, John Howard of CRX sent the following email and letter to Mr. Becker pertaining to a patient who reported they had a package of drugs detained at the Los Angeles Port of Entry 2720 by the FDA.

**From:** John Howard <john@canarx.com>
**Sent:** Wednesday, July 31, 2019 1:29 PM
**To:** Gary Becker <gary@scriptsourcing.com>
**Cc:** Barb <barb@canarx.com>
**Subject:** RE: FDA Letter - Columbus Community Hospital

Hi Gary,

Thanks for sending this over. As mentioned on the call we will be contacting the member today to offer them a copay reimbursement for a 30 day supply of their medication at a loca pharmacy. At the same time we will issue a replacement order at no cost right away.

Attached is the letter we offer to members if they would like to write back to the FDA.

Thanks
John

Dear Deborah Hsu

I have received your notice dated Jul 08, 2019 that a package of medicine that my doctor's office prescribed for me and that has been dispensed to me by the pharmacy from which I ordered it has been detained by you at Los Angeles Port of Entry 2720.
I believe that my right to bring this medicine into the country is safe guarded by the FDA's personal importation policy, and that I have complied with that policy in all pertinent respects, including the following:

(1) The medicine was prescribed for me by my certified family nurse practitioner, who is supervising my treatment using the medicine. My physician is:

(2) The medicine in question does not represent an unreasonable risk and, in fact, is a brand-name drug approved by the FDA in the United States and dispensed to me by a licensed pharmacy who is shipping it directly to me.
(3) The medicine is for my personal use and I do not intend any commercial use of the medicine. The amount that I am importing is no more than a three-month supply.
I need the medicine to protect my health and if I am deprived of it I fear that I will suffer seriously.
Please release the medicine immediately and allow it to be delivered promptly to me.

Yours truly,

65. A June 30, 2026, email from Bob Howard to Mr. Becker (copying John Howard) also outlines the ongoing conspiratorial relationship between ScriptSourcing and CRX:

91%

1 Message

Summarize

Bob Howard
To: G Becker, J Howard >

11:29 PM

**RE:**

Hi Gary,

We are aware of the package flagged for counterfeit postage, and the pharmacy is inquiring with Royal Mail as to why it was flagged. I'm not sure why it was flagged, as it was through Royal Mail and postage was paid.

Can you provide the details on the member who was reached out to?

Joe is tied up this week, but we are happy to jump on a call.

Cheers,

Bob

**From:** Gary Becker <gary@scriptsourcing.com>
**Sent:** Tuesday, June 30, 2026 4:13 PM
**To:** John Howard <john@canarx.com>
**Cc:** Bob Howard <bob@canarx.com>
**Subject:**

**** EXTERNAL ****

Hi John,

Can you jump on a brief call tomorrow with me, Bob, and Joe Morris?

An FBI agent reached out to a member … and there was also counterfeit postage on a medication shipment that was recently returned.

I am still overseas (in Greece) … and maybe you can merge us on a call together.

Can you help coordinate a call at 12:00 pm est … and call me at (239) 439-5019?

Much appreciated!

All the best!

Gary C. Becker
CEO, ScriptSourcing

### G. Financial Transactions Between CRX and ScriptSourcing

66. On June 27, 2026, legal counsel for Mr. Becker provided a spreadsheet that was labeled as WDVA – CRX – 6.25.2026. This spreadsheet contained a list of shipments of medications into the Western District of Virginia ("WDVA"). These shipments were facilitated by ScriptSourcing and fulfilled by CRX. CRX acted as intermediary between ScriptSourcing and the foreign pharmacies they used to import foreign prescription drugs into the United States. The total count of shipments of FDA regulated medications that were listed was 515 from February 22, 2017, to April 15, 2026. 187 of those shipments occurring from January 1, 2021, to April 15, 2026.

67. For example, Trelegy Ellipta, a prescription inhaler used to treat chronic obstructive pulmonary disease and asthma, was shipped to a patient in Abingdon, Virginia, in Washington County, on at least three occasions in 2023 that were facilitated by ScriptSourcing and fulfilled by CRX.

68. ScriptSourcing paid CRX for facilitating the importation of prescription drugs into the United States primarily by wire and by sending checks through the mail. ScriptSourcing wired money to CRX's FirstCaribbean International Bank Account in Barbados. ScriptSourcing sent checks to a U.S. Postal Service Post Office Box maintained by CRX in Detroit, Michigan.

69. On or about October 1, 2026, Mr. Becker's legal counsel provided an updated spreadsheet of financial transactions between CRX and ScriptSourcing from January 1, 2021, to September 21, 2026, this document was labeled CanaRx Analysis – August 1 2026. According to this document, there were approximately 16,549 prescription drugs dispensed in relation to the conspiracy between CRX and ScriptSourcing, with approximately 238 of those shipped to locations within the Western District of Virginia. Below is a summary of the financial transactions by year between CRX and ScriptSourcing:

| *ScriptSourcing Payments to CRX* | |
|---|---|
| **Year** | **Sum of Amount** |
| 2021 | $ (1,285,994.82) |
| 2022 | $ (1,181,116.26) |
| 2023 | $ (810,231.70) |
| 2024 | $ (1,418,607.70) |
| 2025 | $ (915,041.98) |
| 2026 | $ (652,414.50) |
| **Grand Total** | **$ (6,263,406.96)** |

| *CRX Payments to ScriptSourcing* | |
|---|---|
| **Year** | **Sum of Amount** |
| 2021 | $ 462.22 |
| 2022 | $ 925.01 |
| 2023 | $ 594.07 |
| 2024 | $ 266.94 |
| 2025 | $ 341.57 |
| 2026 | $ 106.02 |
| **Grand Total** | **$ 2,695.83** |

70. There is probable cause to believe these payments, which were recorded in the financial records of ScriptSourcing, were not made in furtherance of any legitimate business purpose. Their financial relationship was established and maintained for the purpose of conspiring to unlawfully import illegal prescription medications into the United States from Canada and other countries in circumvention of law.

**H. Cooperating Defendant – Recorded Phone Calls**

71. On June 17, 2026, Mr. Becker had a recorded conversation with John Howard, CEO of CRX. John Howard was in New York at the time of the call. Mr. Becker informed John Howard that there would be an uptick in future orders from ScriptSourcing. John Howard said that he does not see changes in order status daily but does see the changes on the monthly reports. Mr. Becker informed John Howard that a consultant he had communicated with shared with him that the FDA had an increased focus on importation and wants to make an example of larger entities, similar to what Gilead was doing in "our civil case." Mr. Becker told him that the playbook was going to be the pharmaceutical companies begin with civil suits and the government then mirrors the civil cases. John Howard said he had not heard that and Mr. Becker said the consultant reads a lot of press releases. Mr. Becker shared a press release that talked about Gilead suing a company about HIV medications and then the government pursuing a criminal case. Mr. Becker said the owners

of the company both were convicted and received something like 20 years of prison. John Howard asked Mr. Becker to text him the case. Mr. Becker said the consultant told him the government was targeting “illegal international pharmacy programs”. Mr. Becker said it was possible and it was the first time he had heard of that. John Howard said he was aware that the FDA had increased enforcement at the border but more or less looking for commercial importation programs and not personal importation. John Howard said CRX had not seen an uptick in seizures or delays at the border and it has been relatively smooth. John Howard said he didn’t believe ScriptSourcing’s name was affiliated with the package and the invoice had the CRX label on it. And the invoice is included to show that it was purchased and owned by the person who is personally importing the medication for Customs to verify. Mr. Becker asked if there was anything that “we” can do to keep packages from getting seized or stuck. John Howard said that it was at the discretion of the officers at the borders. John Howard said he would talk to Bob, likely referring to President and Director of CRX, Bob Howard. John Howard was only aware of a few packages that were delayed or stuck at the border. John Howard said that CRX doesn’t want to falsely declare anything and the way they declare everything “these days” is by the book per FDA’s personal importation policy.

72. On June 24, 2026, Mr. Becker had a recorded phone call with John Howard. John Howard discussed that Colorado had just been approved by the FDA under Section 804. John Howard said that there were now two states that were approved.

73. On July 6, 2026, Mr. Becker had a recorded phone call with John Howard. Also on the call was Bob Howard. Mr. Becker shared his concern with the two about a client Solaris Health Holdings, where one of ScriptSourcing’s members was approached at their workplace by two FBI agents about a shipment of Jardiance. The FBI agents told the member the medications were misbranded and unapproved. One of the two indicated they were aware of this situation. John

Howard or Bob Howard said they had a policy in place since urology (referring to the incident described with Solaris that involved Urology Group) that medications are not allowed to go to a workplace that could be in any way health related. This was done to ensure there was no confusion whether it was for personal use or for the company. Mr. Becker said he was trying to stay under the radar and was concerned about the attention and the uptick in seizures. Mr. Becker said the FBI agents also were believed to have talked to Dan Scharff, Solaris's legal counsel. John Howard or Bob Howard said he was not worried about an investigation about counterfeit drugs at all because they have been the same company for 23 years, they use all licensed pharmacies by the countries and they are fully insured. Investigations are not a concern of CRX's at all. (Note: Due to the call being a three-way call, it was difficult to discern between John Howard and Bob Howard.)

74. These phone calls, based on my training and experience, show that John Howard was aware of the routes for importation of drugs from Canada into the United States and has tried to mold them to fit CRX's illegal drug importation program. These phone calls also show that John Howard and Bob Howard were aware that these drugs were not allowed to enter into the United States legally.

### I. Cooperating Defendant - CRX Detained Shipments

75. On or about June 2, 2026, legal counsel for Mr. Becker provided a list of shipments that were en route or being prepared to be imported by CRX. The information provided was the member's name, medication, shipping code and carrier, and shipping status. This information was conveyed to FDA-OCI's International Operations Program.

76. One of the packages was known to contain Neupro, an FDA regulated drug indicated for the treatment of Parkinson's disease and Restless Legs Syndrome. The tracking

number for this package was LT396211090GB. When reviewing tracking information on USPS's website, I was informed that the tracking information could not be shown due to the package having counterfeit postage. This package was flagged by FDA-OCI for examination at John F. Kennedy's port of entry. I was provided with photos of the shipment and the contents of the parcel from the examination. The photos revealed that the package was described as "Personal use Rx medication." The content of the package was Neupro. The Neupro packaging had a statement on it that said for "UK only." This statement, along with the package originating from Cedarwood Pharmacy located the United Kingdom, is indicative that the medication inside of it was not approved for the American market by the FDA. As previously described, this would make the Neupro that was sent by Cedarwood Pharmacy at the direction of CRX and ScriptSourcing a misbranded drug being distributed into the United States.

77. Other packages were also detained based on the information provided by Mr. Becker. Based on the tracking information provided, FDA-OCI International Operations Program Special Agent ("SA") Darryl Polk was able to inspect some of these packages after they were detained by U.S. Customs and Border Protection. I was able to review the photos taken by SA Polk and confirmed that these packages contained what appeared to be:

a. A prescription from a U.S. based doctor;
b. An order invoice from CRX with the dates 5/22/2026, 5/22/2026, 5/23/2026, and 5/25/2026;
c. Patient counselling pertaining to the medicine;
d. A medication with a dispensing label from Point Cook Pharmacy, located at Building 1/1-11 Dunnings Rd, Point Cook VIC 3030, Australia.

78. On July 8, 2026, I searched the FDA's Drug Establishments Current Registration Site ("DECRS") for names associated with Point Cook Pharmacy. My search did not show that Point Cook Pharmacy was a registered establishment with the FDA to manufacture, prepare, propagate, compound or process drugs that are distributed in the U.S. or marketed for import to the U.S.

79. According to pharmacy.vic.gov.au, Point Cook Pharmacy is a registered pharmacy in Australia. In my research, I have not had any indications that Point Cook Pharmacy is a registered pharmacy in the U.S.

**J. Probable Cause: Illicit Importation of Misbranded Drugs**

80. Based on my review of publicly available materials, statements made publicly by CRX employees and ScriptSourcing employees while performing business on behalf of their respective employers, statements made by CRX employees on recorded phone calls, and email correspondence from ScriptSourcing employees and CRX employees, there is probable cause to believe that CRX illegally imported or caused the illegal importation of prescription drugs into the United States in violation of Title 21 U.S.C. § 331 (t) and (aa), caused the introduction into interstate commerce of misbranded drugs in violation of 21 U.S.C. § 331(a), conspired with ScriptSourcing and others to do those acts in violation of Title 18 U.S.C. § 371, and smuggled by knowingly and willfully importing merchandise contrary to law in violation of Title 18 U.S.C. § 545. These drugs are misbranded in that they are new drugs that do not bear the FDA-approved labeling and they are not coming from U.S. licensed pharmacies.

81. Specifically, ScriptSourcing's business practices involved:

a. Illegally importing or causing the illegal importation of prescription drugs from international sources, including Canada, United Kingdom, Australia, and New Zealand that are not authorized trading partners in the secure U.S. supply chain.

b. The use of foreign labeling and the shipment of drugs that are not approved by the FDA for distribution in the U.S.

c. Marketing of drugs to U.S. patients through employer health plans, without meeting the legal requirements for either personal-use or Section 804 Importation Programs (SIPs) pathways under 21 U.S.C. § 384.

82. CRX's business practices involve:

a. Illegally importing or causing the illegal importation of prescription drugs from foreign countries.

b. The use of foreign labeling and the shipment of drugs that are not approved by the FDA for distribution in the U.S.

c. Conspiring with ScriptSourcing to import drugs into the U.S., without meeting the legal requirements for either personal-use or SIP pathways under 21 U.S.C. § 384.

83. Statements and other communications made by employees of ScriptSourcing, including their promotion of international drug sourcing as a cost-saving measure, provide further evidence of the intent to bypass U.S. regulatory requirements for prescription drug importation while advertising that the drugs offered are FDA compliant.

84. ScriptSourcing's program involved them conspiring with international companies, such as CRX, that work with international pharmacies that are neither licensed in the United States or registered with the Secretary of HHS in order to coordinate, sell, distribute, and dispense prescription drugs to U.S. patients outside the secure U.S. supply chain.

85. Based on these statements, along with promotional material describing the cost-saving nature of international drug sourcing, I have probable cause to believe that ScriptSourcing and CRX engaged in criminal activity related to the illegal importation of prescription drugs, which are also necessarily misbranded because they are distributed in an illegal supply chain.

**K. Probable Cause: Conspiracy**

86. Based on the evidence described previously, there is probable cause to believe that ScriptSourcing and CRX entered into an agreement to violate federal drug importation laws by:

a. Importing prescription drugs in the United States in violation of 21 U.S.C. § 331 (t) and (aa).

b. Introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. § 331(a).

c. Operating outside the FDA-regulated drug supply chain without proper authorization.

d. Smuggling; knowingly and willfully importing merchandise contrary to law in violation of Title 18 U.S.C. § 545.

e. Felony Conspiracy; Title 18 U.S.C. § 371 prohibits conspiring to commit an offense against the United States, or to defraud the United States or an agency thereof and doing an act to effect the object of the conspiracy.

87. This agreement is evidenced by the coordinated business relationship between the target entities, wherein ScriptSourcing marketed illegal drug importation services to U.S. employers and directs patients to CRX, while CRX worked with foreign pharmacies to ship prescription drugs directly to U.S. patients and coordinated with ScriptSourcing employees throughout the process.

88. CRX's knowledge and intent: CRX demonstrates knowledge of the illegal nature of their activities by shipping drugs intended for foreign to addresses in the United States, including addresses in the Western District of Virginia. Further, their knowledge of the illegal nature of their activities has been officially communicated to them via two FDA Warning Letters.[13]

89. The conspirators, ScriptSourcing and CRX, committed numerous overt acts in furtherance of their agreement to illegally import prescription drugs, including but not limited to:

a. Coordinated communications: As previously described in this document, the conspirators coordinated with each other regarding patient orders and logistics.

b. Marketing and customer acquisition: ScriptSourcing marketed the illegal importation of prescription drugs and made statements that they operated throughout the country. ScriptSourcing worked directly with CRX for prescription fulfillment. ScriptSourcing provided enrollment materials and coordination services.

c. Physical drug shipments: CRX shipped prescription drugs from Canada and other countries to patients in the Western District of Virginia. To facilitate shipments, they utilized international mail services to transport drugs across international borders, some of which were detained pursuant to this investigation.

90. Based on the foregoing, there is probable cause to believe that ScriptSourcing and CRX have conspired to violate federal law by conspiring to commit and by facilitating the importation or smuggling of prescription goods that are misbranded or contrary to federal law.

91. This investigation has shown that the representatives of CRX that are responsible for CRX's alleged criminal activity were, among other people, John Howard and Bob Howard.

---

[13] The most recent warning letter, issued on February 26, 2019, is available at: https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/canarx-services-inc-554740-02262019.

## CONCLUSION

92. Your affiant believes that based on the above described facts and circumstances, and upon your affiant's training, knowledge, and experience, there is probable cause to believe that between February 22, 2017, and April 15, 2026, in the Western District of Virginia and elsewhere, CRX, John Howard (acting as a responsible corporate officer of CRX), Giles Robert Howard (acting as a responsible corporate officer of CRX), ScriptSourcing, and Gary Becker (acting as a responsible corporate officer of ScriptSourcing) conspired to commit and committed the offenses of importing prescription drugs in the United States in violation of 21 U.S.C. § 331 (t) and (aa); introducing misbranded drugs into interstate commerce in violation of 21 U.S.C. § 331(a); and smuggling by knowingly and willfully importing merchandise contrary to law in violation of Title 18 U.S.C. § 545. They also conspired to defraud FDA and CPB of their regulatory authority as shown in this affidavit was in violations Title 18 U.S.C. § 371, and did so with the intent to defraud and mislead, a felony conspiracy.

## REQUEST FOR SEALING

93. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is not public. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation because the subjects of the investigation would be aware of specific investigative activity by law enforcement agents.

Dustin Dobbs
Special Agent
Office of Criminal Investigations
U.S. Food and Drug Administration

Reviewed by: AUSA Danielle Stone

Subscribed to and sworn before me telephonically
this 29th day of October, 2026.

HONORABLE SCOTT H. JONES
UNITED STATES MAGISTRATE